IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 7, 2008

**HERMAN PARHAM v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 02-07973     Mark Ward, Judge**

**No. W2007-02272-CCA-R3-PC  - Filed March 25, 2009**

The petitioner, Herman Parham, appeals the post-conviction court's denial of his petition for post-conviction relief.  On appeal, he argues that he received the ineffective assistance of counsel. Specifically, he argues that his trial counsel was ineffective in  failing to retrieve a bullet from a tree at the crime scene.  After a thorough review of the record and the parties' briefs, the judgment of the post-conviction court denying post-conviction relief is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which DAVID H. WELLES and THOMAS T. WOODALL, JJ., joined.

Patrick E. Stegall, Memphis, Tennessee, for the appellant, Herman Parham.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; William L. Gibbons, District Attorney General; and Paul Hagerman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The petitioner was convicted of two counts of second degree murder.  Thereafter, his convictions were merged and he was sentenced to twenty-five years in the Tennessee Department of Correction.  The petitioner appealed arguing that evidence was insufficient to support the conviction, that the trial court erred in instructing the jury on flight, and that his sentence was excessive.  On direct appeal, this court affirmed the petitioner's conviction and sentence.  *State v. Herman Parham*, No. W2004-00059-CCA-R3-CD, 2005 WL 2372755 (Tenn. Crim. App., at Jackson, Sept. 27, 2005). The following is a recitation of the convicting evidence set forth in this court's opinion on direct appeal:

> On April 14, 2002, the eleven-year-old victim, Damien Woodard, was shot and killed while playing football with his father on the playground at the Oak Park Apartments in Memphis. The defendant later admitted being involved in the

shooting, explaining that it occurred as a result of a conflict he had with an individual named Christopher Williams.

Daniel "Moonhead" Muhammad, who had known both the defendant and his brother, Patrick Parham, for approximately three years, testified that early on the day of the shooting he saw Patrick Parham driving the defendant's white Crown Victoria near the Oak Park Apartments. Muhammad recalled that as Patrick Parham stopped to speak to him, an individual named Michael Williams approached the car. According to Muhammad, he warned Patrick Parham to leave because Michael Williams might "try something" and as he did so, Michael Williams "cocked his pistol and . . . started shooting" at the car. Muhammad, who lived across the street from the apartments, testified that later that same day, he saw "cars go in the back drive" of the complex. At that point, Muhammad began walking toward the apartments and was confronted by two men, one of whom was armed with a pistol. Muhammad testified that when the individual with the gun asked if he knew anyone named "Moonhead," he responded in the negative because he feared for his life. Muhammad stated that the men left and he went to a friend's apartment.

Muhammad testified that shortly thereafter, he received a telephone call from Patrick Parham, who asked, "[T]ell me the truth[,] did you set me up?" Muhammad denied having done so and Patrick Parham hung up the telephone. Muhammad then returned to his residence, where he later heard that a shooting had taken place at the Oak Park Apartments. After hearing the news, Muhammad returned to the apartments and saw "a little boy" lying on the ground. According to Muhammad, the defendant telephoned him later in the evening and said, "[S]omebody's going to pay for my car," to which Muhammad responded, "[A] little boy got shot," before hanging up on the defendant.

LaRhonda Murphy, who was a resident of the Oak Park Apartments, testified that on the day of the offense, the weather was nice and "a lot of people were outside." She testified that early that day she saw Michael Williams shooting at Patrick Parham. Ms. Murphy recalled that at approximately 6:00 p.m., she walked to the parking lot with her mother and brother and spoke to a friend. While she was in the parking lot, Ms. Murphy noticed the crowd of adults and children running and then saw the defendant standing nearby holding a gun. According to Ms. Murphy, the defendant ordered Christopher "Weedy" Williams, a brother to Michael Williams, to "[C]ome here," and when Christopher Williams fled, the defendant fired several shots in his direction. Ms. Murphy testified that the defendant's cousin, Jeremy Parham, was also in possession of a gun and that he also fired his weapon.

Herman Sallie, who was charged with facilitation of first degree murder in the death of the victim, testified that on the day of the offense, he drove from his residence to the Clayborn Homes, where the defendant's mother resided. Sallie stated that he was walking toward the basketball court when he saw Patrick Parham drive by in the defendant's white Crown Victoria. According to Sallie, he left but

returned a short time later and found the defendant, who was angry because someone had shot his car while Patrick Parham was driving near the Oak Park Apartments. Sallie testified that the defendant told him that he was going to "get some guns" and asked Sallie to meet him at his mother's house. Sallie stated that he encountered Izeal Jones, who asked to go with him. When they arrived at the defendant's mother's residence, Sallie saw the defendant, Patrick Parham, Jeremy Parham, Travis Curry, and Patrick Brown in a green Grand Marquis and overheard the defendant's mother say, "[D]on't leave the house because the police ha[ve] already been notified about the car getting shot." He recalled that the defendant responded that he was going to kill the person who shot his car. At that point, Sallie, the defendant, Jones, Rodicus Johnson, and Derrick Crumpton got into Sallie's teal green Cutlass. Patrick Parham, Jeremy Parham, Curry, and Brown were in the Grand Marquis. The two cars left the residence with Sallie's car in the lead. They stopped briefly at a house where the defendant talked to some men on the front porch in an unsuccessful effort to get an "AK-47." According to Sallie, when they saw a police cruiser, the defendant directed him to stop the car, got out, walked a short distance, and got into Brown's car.

Sallie testified that when they reached the Oak Park Apartments, Johnson got out of his car and it "kind of dawned on [him] what was going on." He claimed that he told Johnson that he did not want to sit in the parked car because "somebody could come back and run and start shooting and [he didn't] have any guns . . . any kind of protection." He also expressed concern that his car was particularly recognizable because of its unique paint job. Sallie stated that he, Crumpton, and Jones left, stopping at a nearby residence so that Jones could speak to the resident about buying a car. According to Sallie, he remained in the car while Jones went inside the residence and Crumpton walked down the street. Sallie stated that when he heard gunshots approximately fifteen minutes later, Jones ran to the car and the two men drove away. Sallie testified that he picked up Johnson and the defendant, both of whom were running from the direction of the Oak Park Apartments. Sallie recalled the defendant saying, "I think I emptied my clip," and Johnson say, "I think I hit his little brother." According to Sallie, one of the other occupants of the car asked, "[H]ow do you know you hit somebody?" The defendant responded, "[W]e was hitting the sh* * out of them people." Johnson then said, "I saw a boy laying on the ground and a lady ran over to him."

After the shooting, Sallie drove back to the Clayborn Homes, where Johnson and the defendant got out of the vehicle. He then drove to a park to drop off Jones and Crumpton. Sallie testified that while he was at the park, he saw Brown talking to another individual. According to Sallie, he heard Brown say that "he didn't really see what was happening" and that he "was hearing gunshot[s]" and dropped his gun while trying to jump over a fence. Sallie testified that upon hearing this, he drove back to the defendant's mother's residence, where the defendant was standing outside, and asked the defendant what had happened. He remembered that the defendant explained "that everybody was shooting and that he chased the dude who

-3-

[was] supposed to ha[ve] shot his car . . . but he missed him." Sallie testified that when he saw three police cars driving toward the residence, he got into a car with his sister, who happened to be driving by. He returned to the defendant's mother's residence a short time later, got into his own car, and drove home.

Sallie testified that he learned later that night from a television news report that the victim had been killed. He stated that he reported the news to the defendant and, on the following day, received a telephone call from Jones, who informed him that he had made a statement to the police. At Jones' suggestion, he telephoned a Lieutenant McMahan and provided a statement. Sallie confirmed that he had been charged with facilitation of first degree murder in the victim's death. He explained that he had chosen to testify to "clarify things" and that he had not been promised anything by the state in exchange for his testimony.

Regina Lee, a resident of the Oak Park Apartments, testified that she was visiting her sister's house across the street when she saw two black men get out of two cars that had been driven behind the complex. She stated that the lighter-skinned of the two men remarked that he was going to "take care of some business over there," and then pulled out a gun and ran toward the sandbox at the apartment playground. Ms. Lee testified that she became frightened because her sister's children were playing at the sandbox and drove with her sister toward the playground. Ms. Lee stated that when she heard five or six gunshots, she got out of the vehicle, ran to the playground, and saw the victim lying under a tree.

Christopher Williams testified that early on the day of the shooting, he was with Muhammad when Patrick Parham drove up in the defendant's white Crown Victoria, parked the car, and sat on the hood. He recalled that as his brother, Michael Williams, approached him, Patrick Parham drove away at a high rate of speed and, as he slowed down at the mailbox, was shot at by Michael Williams. Williams testified that later that day, he was standing near the sandbox at the apartment complex when he heard someone shout his nickname, "Weedy." When he turned around, he saw the defendant, Patrick Parham, and another black male walking in his direction. He recalled that he took a few steps toward the men but fled when he noticed that they were armed. He stated that when he began to run, "they start[ed] firing." Williams, who claimed that he did not have a weapon, testified that he "ran out the Willet" and "on South Parkway [he] turned left and . . . ducked down behind a house." He contended that shortly thereafter, he returned to the playground area, where his brother and some others were standing on a walkway. Williams stated that as he joined his brother, he saw the victim, who was lying on the ground, and then learned that he had been killed. He recalled that he had seen the victim and his father playing football on the playground.

Christopher Williams testified that he was arrested after the shooting on an unrelated charge and had been incarcerated with the defendant for a brief time. He claimed that the defendant offered to pay him to keep quiet about the defendant's

involvement in the shooting. According to Williams, the defendant said, "[D]on't say nothing in the trial, . . . tell my lawyer that Moonhead was shooting at me [and] I['ll] give you $10,000. I['ll] give you five now, five when you tell my lawyer that Moonhead shot at me." Williams testified that while he initially accepted the offer, he told the defendant several days later that he had not "talked to [anyone] since [he had] been [incarcerated]," and the defendant left. During cross-examination, Williams explained that his brother shot at Patrick Parham because "they are enemies. . . . Same thing happened in 2000 . . . that they hadn't got squashed yet."

Izeal Jones, who had known the defendant and Patrick Parham for his entire life, recalled that on the day of the shooting, he was playing at a park near Clayborn Homes when Sallie arrived to take him "to Curley's house." Jones testified that Sallie first drove to the defendant's mother's house, where he picked up the defendant and Johnson, and that at some point during the drive, Sallie stopped the car "to let [the defendant] out because he said [the defendant] saw the police-and [the defendant] got out." According to Jones, Sallie continued on to "Curley's mamma's house," where the following events transpired:

> We got over to Curley's mamma's house, got out of the car. So me and Jonathan, we smoked some weed sitting on the side we smoked, so went in the house. [Sallie] and [Crumpton] they was sitting in the car, they went back to sit in the car and [Sallie] got out of the car and came in the house. So we was in the house and when we c[a]me back out we heard some shots. Heard some shots, went back in the house, c[a]me back out [of the house] they was sitting in the car in the back seat . . . . [I]t was [Johnson], [the defendant], [Crumpton], and [Sallie].

Jones testified that he got back into the car and as they drove away, he heard either Johnson or the defendant, both of whom had guns, say, "I killed that n* * * *r, one of them n* * * *rs is dead ." Jones stated that he asked Sallie to drop him off because he didn't want to be involved. He recalled that the defendant asked him to "hold the gun" but he refused, got out of the car, and walked away. Jones testified that two days later, he learned that the police were looking for him, so he went to the police station and provided a statement. During cross-examination, Jones acknowledged that the defendant did not appear angry when he first got into Sallie's car.

Joe Edward Hill, Jr., who was at the Oak Park apartments on the day of the shooting to do a tattoo for a woman who lived there, testified that as he stood in the parking lot, the defendant and another man, both of whom were armed, walked up and the defendant asked if Hill had seen "Humphead," who he claimed had shot his car. According to Hill, the two men walked toward the playground "in a gangster like 'f* * * the world' mode." Hill recalled that the defendant then shouted, "[H]ey, little n* * * *r," and began firing his gun in a "sweep motion" from right to left. Hill

testified that the victim "was hit" and that "the way [the defendant] swung the gun shooting . . . ended up over where the [victim] was." According to Hill, the defendant and the other man "stood over" the victim before running away and that as they ran by, the defendant said, "[Y]a'll know where we're at, tell them where we're at." Hill testified that when he saw blood on the victim's arm, he used his cellular telephone to call 911.

Dedrick Phillips, a resident of the Oak Park Apartments, testified that early on the day of the offense, he heard gunshots, heard Christopher Williams and another man "bragging that they ran somebody off shooting at them," and then turned to see the back of a white Crown Victoria being driven away. Phillips recalled that the driver of the Crown Victoria shouted that he would "be back." Phillips recalled that later that afternoon, he was standing outside talking to a girl when he heard "shots just ring out" without "any kind of warning." He testified that he "didn't stand around to look see what was going on" and ran "around the building" where he saw the victim "dead on the ground." Phillips recalled that he saw three men with guns but only recognized the defendant, whom he knew as "Baby Red." According to Phillips, all three of the men were shooting. He stated that "at first it seemed like they were shooting at Weedy, but he . . . ran and they just kept shooting." Phillips stated that when the gunfire ended, he saw the three men standing over the victim.

Tyrus Moore, who was also a resident of the Oak Park Apartments, testified that on the day of the shooting, he walked to a nearby store to purchase chips and a drink and when he returned a few minutes later, he heard a single gunshot. He recalled that he was confronted by two men with handguns, one of whom he recognized as the defendant. He testified that the defendant pointed the gun at him and said, "Bitch, you got something to do with this too?" Moore, who explained that he was paralyzed with fear and was unable to respond, stated that the men stood in front of him for approximately ten seconds before running away. Shortly thereafter, Moore saw Christopher Williams, who was unarmed, running through the complex.

The victim's father, Essie L. Moore, Jr., testified that on the day of the offense, he was playing football on the playground with the victim and several other children. He recalled that "the playground was full, the sandbox was full, [there were] kids riding their bikes." Moore, who had gone to sit on his porch, heard what sounded like firecrackers and turned to see people running up a walkway followed by three men "chasing some dude." According to Moore, the victim was shot in the head as he chased a football that had rolled down a hill. He testified that he ran to the victim and placed his finger over a hole in his head in an effort to stop the bleeding. Moore, who recalled that the entire incident lasted only about a minute, stated that he was unable to identify the gunmen.

Officer William Acred of the Memphis Police Department, who responded to the call that shots had been fired at the Oak Park Apartments, testified that he found the victim lying "underneath a tree shot in the head surrounded by his parents."

-6-

The officer stated that he tried to preserve the scene, attempted to get a description of the suspect, and called for backup. He described the crime scene as "chaotic," with some thirty to forty people milling around the area.

Officer Marcus Berryman, a crime scene investigator with the Memphis Police Department, testified that approximately twenty officers responded to the scene. The officer took photographs and helped homicide detectives look for and document evidence. He stated that he collected a total of six spent shell casings, two of which were from .380 caliber and four of which were .45 caliber. One of the .380 shell casings was discovered just in front of the tree where the victim was found.

Dr. Teresa Allen Campbell, who performed an autopsy of the victim, testified that the cause of death was a single gunshot wound to the head. According to Dr. Campbell, the bullet entered the victim's forehead "about 0.35 inches to the right of midline" and then went "into the right front lobe of the brain, and then it went into the right ventricle of the brain . . . the basal ganglia, the thalamus of the brain, then it went into the right perietal lobe of the brain . . . then it went through the right occipital lobe of the brain, . . . and then it exited through the skull bone where two of the skull bones come together." She testified that the bullet exited the victim's skull "a little bit more to the right of midline 0.7 inches." Dr. Campbell testified that there was no stippling on the entrance wound, leading her to conclude that the shot was fired from more than two feet away. According to Dr. Campbell, she could not definitively determine whether the shot came from a .380 or a .45 because the width of the entrance wound was .4 inches, a size which could have been caused by either weapon.

Heath Barker, a Firearms Identification Specialist with the Tennessee Bureau of Investigation, testified that he performed an examination of the shell casings collected from the crime scene. He concluded that two of the Remington-Peters (RP) .380 casings were fired from one firearm, two of the RP .45 casings were fired from a second firearm, and the remaining two RP .45 casings were fired from a third firearm. All were fired from semi-automatic weapons. During cross-examination, Barker testified that the diameter of a .45 caliber bullet is .441 inches and that the diameter of a .380 caliber bullet is .347 inches.

Margaret West, a resident of the Oak Park Apartments, testified on behalf of the defendant. She stated that at approximately 6:00 p .m. on the day of the shooting, she was standing outside talking to a neighbor when she heard gunfire. Ms. West recalled seeing at least four or five young black men with handguns running through the complex. Ms. West identified one of the armed individuals as Michael Williams.

Cameron Knighten, a Sergeant with the Shelby County Training Center, testified that both the defendant and Christopher Williams were housed in her unit from February until May of 2001. She stated that she never saw any animosity between the two during that time. Delores Houston, another employee of the Shelby

-7-

County Training Center, also testified that there was no animosity between the defendant and Christopher Williams during their incarceration together.

The defendant testified that he had known Michael and Christopher Williams since 1999 and that in 2000, Michael Williams and some others burglarized his mother's residence. The defendant claimed that after he learned of Michael Williams's involvement in the burglary, they were "arguing every day . . . then it got to a point where [they] had settled it." According to the defendant, Michael Williams was arrested in 2000 after he brandished a gun at the defendant at the Oak Park Apartments. He contended that when Michael Williams was released from jail, the two young men agreed to meet in the middle of a park to settle the dispute. The defendant testified that both he and Michael Williams were armed on the day that they met and that they reached an agreement to end the feud. He stated that during the following year, he was housed with Christopher Williams at the Shelby County Training Center and the two never had any disputes. He explained that Michael Williams was housed in a different unit but that the two interacted at meals and other group activities and that there were no problems between them.

The defendant testified that at the time of the shooting, he went to the Oak Park Apartments every day to shoot dice. He stated that on the day of the offense, he was at his brother's residence taking a nap when his brother woke him and informed him that Michael Williams had tried to shoot him. The defendant testified that he saw a bullet hole in his car and, angered because his mother or young daughter could have been hurt had they been inside the car, took his gun and went to his mother's residence in the Clayborn Homes. The defendant stated that he asked Sallie, who was standing near his mother's house, to drive him to the Oak Park Apartments so that he could confront Michael Williams. The defendant claimed that Johnson and Crumpton asked if they could accompany him and denied "rounding them up." He testified that Jones also accompanied them and that Brown, Curry, Jeremy Parham, and Patrick Parham followed in another car. According to the defendant, when he saw a police car as they were driving toward the apartments, he got out of Sallie's car, walked down the street a short distance, and then got into the car being driven by Brown.

The defendant testified that when they arrived at the Oak Park Apartments, he told the others to stay in the car because he was "fixing to go and see what's going on." He stated that as he walked along the sidewalk, he noticed that Johnson was behind him. He explained that he did not tell Johnson to leave because he "knew he was only there for [his] protection." The defendant testified that when he saw Christopher Williams, he shouted, "[C]ome here, Chris." According to the defendant, Christopher Williams "took about three or four steps" and then "stopped and . . . shot at [him]." The defendant claimed that he shot back in self-defense and that he fired his gun only twice. The defendant maintained that while some children were playing nearby, none were in his line of fire. He stated that as soon as he had

fired the shots, he "struck out running" back toward Sallie's car. The defendant claimed that he heard approximately sixteen more gunshots as he ran away.

The defendant testified that he ran back to the parking lot, got into Sallie's car, and was driven to his mother's house. He stated that later that evening, he left his mother's residence and joined a dice game that was being played in "the cut" at the Clayborn Homes. The defendant claimed that he first learned that the victim had been shot when a friend named Angie telephoned him while he was playing dice. He testified that upon learning of the victim's death, he paid "a junkie" to drive him to a motel and then called his mother to ask her to visit him. According to the defendant, his mother was angry because Patrick Parham had been arrested in connection with the victim's death and she told him that she was going to tell the police where he was hiding. He testified that he then moved to a different motel, where he received a call on his cell phone from Lieutenant McMann and agreed to turn himself in to the police. The next morning, the defendant telephoned Lieutenant McMann and informed her that he was going to his mother's residence and that the police could find him there. He stated that he found out that the victim had died when he watched the news. The defendant denied going to the complex to kill Michael Williams, contending that he "was going over there like in 2000 to see Mike, ask him was there a problem or whether it was a mistake, what was going on, why did he shoot at [his] brother, shoot at [his] car."

During cross-examination, the defendant acknowledged that he was angry because he believed Michael Williams had tried to kill his brother and had been assisted by Muhammad. He nevertheless claimed that he was calm when he asked Sallie to drive him to the Oak Park Apartments and denied telling Sallie that "someone was going to die." He conceded that he armed himself with a .45 caliber semi-automatic handgun but claimed that his intention was only to speak with Michael Williams. The defendant denied threatening Tyrus Moore with a gun and denied having a conversation with Hill. He claimed that he did not see the victim or any other children playing football and that Christopher Williams was surrounded by ten male companions rather than one female. The defendant admitted telling detectives that he had chased Christopher Williams but contended that he made the admission only because he was pressured by the detectives. He stated that he was scared when he was being interviewed by the police because "[t]hey acted like [he] had killed the President." The defendant acknowledged that he had lied to police when he told them that he had given his gun to his cousin, Santangela Parham.

Sergeant James Fitzpatrick of the Memphis Police Department, who was called as a rebuttal witness, testified that he took a statement from the defendant. The defendant's statement was then read into evidence by the Sergeant. In the statement, the defendant admitted being present when the victim was shot but denied responsibility saying, "[I]t's a strong possibility that Rodriguez Johnson a/k/a Rod shot [the victim]."

-9-

*Id.* at *1 - 8.

The petitioner filed a timely petition for post-conviction relief. Thereafter, post-conviction counsel was appointed and an evidentiary hearing was held. At the hearing, the petitioner asserted that counsel was ineffective in failing to call co-defendant, Rodricus Johnson, and another possible eyewitness identified by the petitioner as witnesses at trial. The petitioner also asserted that counsel failed to adequately cross-examine Mr. Herman Sallie regarding the possibility that he received a deal from the state in exchange for his testimony at trial. The petitioner further argued that counsel was ineffective in failing to retrieve the bullet from a tree at the crime scene.

The petitioner testified in pertinent part that, he spoke to an investigator hired by counsel about the case, and claimed that he told the investigator all he needed to know to work the case. However, the petitioner believed that the investigator did not follow through on the investigation. The petitioner testified that the investigator told him that he "went through the chain of command to get the bullet out of the tree," but, the petitioner was never told that "anyone tried to remove that bullet from that tree." The petitioner testified that he told counsel and the investigator that he wanted the bullet removed from the tree. According to the petitioner, counsel did not explain his decision not to have the bullet removed. The petitioner denied that he and counsel discussed the possibility that, if the tree was cut down and a bullet found, testing might show that the bullet came from the petitioner's gun.

Counsel testified that he was appointed by the trial court to serve as the petitioner's counsel, but stated that he handled the case as he would any murder case. Counsel testified that he spent hours at the crime scene, and the two investigators hired by counsel probably spent three times as much time there. Counsel related the facts of the case stating that the victim, a ten-year old child, had been caught in cross-fire. After being shot, the victim's body was positioned near a tree. There appeared to be a bullet hole in the tree with no exit hole, which "[led] us to believe that there was still [a bullet] in the tree." One of counsel's investigators, a twenty-five year veteran homicide detective, "expressed . . . dismay that . . .the Memphis Police Department, hadn't cut the tree down to get the bullet out." The inspector dug for hours in the tree with a pocket knife, but did not find anything. According to counsel, it appeared that the bullet was still in the tree, but he knew of no way to be sure, "other than cutting the tree down and doing cross sections on it[.]" Counsel testified that he considered "trying to go through the process of getting [the] tree cut down," however, he decided against pursuing it because the hole might not have been a bullet hole. Furthermore, the evidence at trial strongly suggested that, assuming it was a bullet hole, the bullet did not come from the petitioner's gun.

According to counsel, uncontroverted testimony at trial showed that at the time of the shooting, the petitioner was walking down the middle of a fifty yard wide court yard, toward Christopher Williams, and Mr. Johnson was located behind, and to the left of the petitioner. Counsel claimed that he argued at trial that "if you drew a line between where Mr. Johnson purportedly was, where the child lay, and . . . the bullet hole in the tree[,] . . .it was almost a direct line." Counsel asserted he further argued that, according to testimony, the petitioner would have been located at a forty-five degree angle from the body and the bullet hole in the tree. Counsel testified that he also

presented this theory to the jury through crime scene sketches and aerial photographs.  He claimed his theory was further supported by the jury's visit to the crime scene and their inspection of the tree.

Counsel explained his decision not to pursue the search for the bullet stating that if the tree was cut down and there was no bullet found, "that is a problem," or if a bullet was found and it was determined to have come from the petitioner's gun, "that's even worse."  Counsel testified that he decided to argue that there had been an "ineffective police investigation," and that the bullet did not come from the petitioner's direction.

Counsel testified that he discussed his strategy with the petitioner.  However, counsel did not remember if the petitioner objected to counsel's strategy, nor did he remember if the petitioner asked him to have the tree cut down.  Counsel stated that although the petitioner may have made such a request, it was more likely that the petitioner asked one of the investigators to cut down the tree.  Counsel  remembered speaking with an investigator about cutting down the tree and recalled that it was counsel's decision not to pursue it.

After taking the matter under advisement, the post-conviction court entered an order denying the petitioner relief.  The petitioner now brings the instant appeal.

ANALYSIS

On appeal, the petitioner contends that the post-conviction court erred in denying relief.  The petitioner argues that counsel was ineffective in failing to recover the bullet from a tree at the crime scene.  The petitioner asserts that "[h]ad this bullet been recovered, ballistics analysis could have shown the caliber of the gun that fired it."  Other arguments made by the petitioner at the post-conviction hearing were not presented by the petitioner on appeal and are therefore waived.  *See* Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. 27(a)(7).

In order for a petitioner to succeed on a post-conviction claim, the petitioner must prove the allegations of fact set forth in his petition by clear and convincing evidence.  Tenn. Code Ann. § 40-30-110(f).  On appeal, this court is required to affirm the post-conviction court's findings unless the petitioner proves that the evidence preponderates against those findings.  *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999).  Our review of the post-conviction court's factual findings, such as findings concerning the credibility of witnesses and the weight and value given their testimony, is de novo with a presumption that the findings are correct.  *See id.*  Our review of the post-conviction court's legal conclusions and application of law to facts is de novo without a presumption of correctness.  *Fields v. State*, 40 S.W.3d 450, 457-58 (Tenn. 2001).

To establish the ineffective assistance of counsel, the petitioner bears the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense rendering the outcome unreliable or fundamentally unfair.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Arnold v. State*, 143 S.W.3d 784, 787 (Tenn. 2004).  Deficient performance is shown if counsel's conduct fell below an objective standard of reasonableness under prevailing professional standards.  *Strickland*, 466 U.S. at 688; *see also Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975) (establishing that representation should be within the range of competence

demanded of attorneys in criminal cases). A fair assessment of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id*. at 689; *see also Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. *See Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a particular strategy or tactical decision failed does not, by itself, establish ineffective assistance of counsel. *Goad v. State,* 938 S.W.2d 363, 369 (Tenn.1996). If a petitioner proves that counsel's representation fell below a reasonable standard, the petitioner must also prove prejudice. Prejudice is shown if, but for counsel's unprofessional errors, there is a reasonable probability that the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694. Both deficient performance and prejudice must be established. *Id.* at 697; *see also Goad v. State*, 938 S.W.2d at 370. If either element of ineffective assistance of counsel has not been established, a court need not address the other element. *Strickland*, 466 U.S. at 697. In considering claims of ineffective assistance of counsel, "[w]e address not what is prudent or appropriate, but only what is constitutionally compelled." *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984).

Regarding counsel's decision not to pursue efforts to retrieve the bullet from the tree at the crime scene, the order of the post-conviction court recites the following findings:

> It is not known whether there is or was a bullet in the tree. The post-conviction court finds that counsel's decision not to take further actions to find what was suspected to be a bullet lodged in the tree was a sound tactical decision. Counsel did not provide deficient performance in failing to look further for the bullet. If he had found a bullet and it matched his client's gun it would have negatively impacted the case. Likewise, if it was discovered that no bullet was lodged in the tree, it would have worked against his argument that the bullet hole indicated another shooter was responsible for the killing. In addition, he was able to argue that the State should have looked for the bullet. Furthermore, the Petitioner has failed to introduce in this court the bullet or any evidence as to whether the bullet is still lodged in the tree or if, in fact, any bullet was ever lodged in the tree. Absent such presentation of evidence, Petitioner could not show prejudice.

The only evidence presented by the petitioner at the post-convection hearing was his own testimony. The petitioner stated that he requested that counsel produce the bullet from the tree. Counsel did not deny that petitioner made such a request. Counsel confirmed that he considered making further attempts to retrieve the bullet, but decided against it in light of the possible damage to the petitioner's case. The court's finding that counsel's decision not to retrieve the bullet from the tree was "a sound tactical decision" is supported by the record. We conclude counsel's tactical decisions to have been informed, based upon adequate preparation, and did not constitute a deficiency by counsel. *See Hellard v. State*, 629 S.W.2d at 9. Moreover, even if a failure to retrieve the bullet from the tree constituted a deficiency on the part of counsel, the petitioner must prove that the deficiency prejudiced the case in some way. The petitioner failed to introduce evidence that the bullet was, at any time, lodged in the tree, nor did the petitioner show that, if a bullet had been found, ballistics testing would have been favorable to his case. Absent such presentation of evidence, the

petitioner failed to show prejudice.  Accordingly, we conclude that the evidence in the record does not preponderate against the post-conviction court's findings.  The issue is without merit.

CONCLUSION

The petitioner has failed to meet his burden of proof regarding his claim of ineffective assistance of counsel and the post-conviction court correctly denied the petition.  Therefore, the judgment of the post-conviction court is affirmed.

_____
J.C. McLIN, JUDGE